UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

San Francisco Division

| | |
|---|---|
| N.B., | Case No. 20-cv-01138-LB |
| Plaintiff, | |
| v. | **ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGEMNT AND DENYING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT** |
| ANDREW SAUL, | |
| Defendant. | |
| | Re: ECF No. 22, 25 |

## INTRODUCTION

The plaintiff N.B. seeks judicial review of a final decision by the Commissioner of the Social Security Administration denying her claim for social-security disability insurance (SSDI) benefits under Title II of the Social Security Act.[1] The plaintiff moved for summary judgment, the Commissioner opposed the motion and filed a cross-motion for summary judgment, and the plaintiff filed a reply.[2] Under Civil Local Rule 16-5, the matter is submitted for decision by this court without oral argument. The court grants the plaintiff's motion, denies the Commissioner's motion, and remands for further proceedings.

---

[1] Compl. – ECF No. 1 at 1–2; Mot. – ECF No. 22-1 at 5. Citations refer to material in the Electronic Case File (ECF); pinpoint citations are to the ECF-generated page numbers at the top of documents.

[2] Mot. – ECF No. 22-1; Cross-Mot. – ECF No. 25; Pl. Reply – ECF No. 26.

## 1. Procedural History

The plaintiff filed an application for SSDI benefits in April 2015.[3] The Commissioner denied her claim on November 2, 2015 and again on May 5, 2016.[4] On June 30, 2016, the plaintiff asked for a hearing before an Administrative Law Judge (ALJ).[5] On January 11, 2018, the ALJ held an initial hearing and heard testimony from a vocational expert and the plaintiff.[6] On May 15, 2018, the ALJ held a supplemental hearing and heard testimony from a medical expert, a different vocational expert, and the plaintiff.[7] The ALJ issued an unfavorable decision on August 16, 2018.[8] On December 11, 2019 the Appeals Council denied the plaintiff's request for review, and the ALJ's decision became the final administrative decision.[9] The plaintiff was not represented by counsel throughout these proceedings.[10] The plaintiff filed this action on February 13, 2020 and the parties each moved for summary judgment.[11] All parties consented to the undersigned's jurisdiction.[12]

## 2. Medical Records

The plaintiff contended that she was disabled because of the following conditions: back injury, urinary incontinence, depression, tibial fracture, and fibular fracture.[13]

---

[3] AR 238–39.

[4] AR 9.

[5] *Id.*

[6] *Id.*

[7] *Id.*

[8] AR 22.

[9] AR 1.

[10] AR 192–93.

[11] Compl. – ECF No. 1; Mot. – ECF No. 22; Cross-Mot. – ECF No. 25.

[12] Consent Forms – ECF Nos. 6, 17.

[13] AR 88.

United States District Court
Northern District of California

The following records were submitted: (1) medical records from Jules P. Steimnitz, M.D.;[14] (2) records from Saint Francis Memorial Hospital;[15] (3) records from Lyon Martin Health Services;[16] (4) medical records from Melvin C. Britton, M.D.;[17] (5) emergency department and hospital records from University of California, San Francisco, Medical Center;[18] (6) medical records from San Francisco Multi-Specialty Medical Group;[19] (7) emergency department and hospital records from Seton Medical Center;[20] (8) a comprehensive psychiatric evaluation from Kyle Van Gaasbeek, Psy. D.;[21] and (9) outpatient records from San Francisco General Hospital.[22]

Because the plaintiff challenges the ALJ's weighing of the opinion of examining psychologist Dr. Van Gaasbeek, this order recounts that opinion fully.

Dr. Van Gaasbeek completed a comprehensive psychiatric evaluation of the plaintiff on October 3, 2015.[23] As part of the examination, he reviewed progress notes from Lyon Martin Health Services.[24] He noted that the plaintiff appeared "a bit disheveled" and that her chief complaints were "back injury and depression."[25] Although she was oriented to time, person, place, and purpose, she was "tearful" and used a walker.[26]

The plaintiff described two major episodes of depression. The first — between 2007 and 2009 — was secondary to a back injury.[27] The plaintiff was treated with psychotherapy, and when she

---

[14] AR 419–22.

[15] AR 423–43.

[16] AR 444–62.

[17] AR 463–67.

[18] AR 468–544.

[19] AR 545–92, 1000–43.

[20] AR 593–920, 1049–87.

[21] AR 922–28.

[22] AR 929–99.

[23] AR 924.

[24] *Id*.

[25] AR 924, 926.

[26] AR 926.

[27] AR 924.

changed careers, her depression improved but she did not recover fully.[28] The second episode occurred in 2013 after she injured her back a second time, and her depression has worsened over time.[29] The plaintiff was not able to continue working and began experiencing relationship problems with her husband. They eventually separated.[30]

The plaintiff described a history of abuse from her first husband in around 2002.[31] After she left her ex-husband, she lived in a domestic-violence shelter.[32]

The plaintiff described her daily activities. She "sometimes stay[ed] in bed all day" and tried to watch tv but couldn't "concentrate on any . . . programs."[33] She stopped cleaning her house and "only bathe[d] once a week."[34] At the time of the evaluation, the plaintiff described "loss of enjoyment with normally pleasurable activities," "not wanting to go anywhere," "arguments with family members," crying, and being "withdrawn" and "angry."[35] Dr. Van Gaasbeek noted "frequent passive suicidal ideation."[36]

The plaintiff's memory and calculations were "good."[37] Her fund of knowledge, concentration, judgment, and insight were "fair."[38] She had marked impairments in her ability to (1) interact with co-workers and the public, (2) maintain regular attendance in a workplace, (3) complete a normal workday without interruptions from a psychiatric condition, and (4) deal with usual workplace stress.[39] Her ability to perform detailed and complex tasks was mildly impaired.[40] She was

---

[28] *Id.*

[29] *Id.*

[30] AR 924–25.

[31] AR 925.

[32] *Id.*

[33] *Id.*

[34] AR 925–26.

[35] AR 924.

[36] AR 926.

[37] *Id.*

[38] AR 926–27.

[39] AR 927–28.

[40] AR 927.

unimpaired in her ability to (1) perform simple, repetitive tasks, (2) accept instructions from supervisors, and (3) perform work activities on a consistent basis without special or additional instruction.[41]

Dr. Van Gaasbeek concluded that the plaintiff's problem was "treatable" with a likelihood of a full but slow recovery.[42]

### 3. Administrative Proceedings

#### 3.1 Disability-Determination Explanations

During the administrative process, non-examining doctors generated two disability-determination explanations, one at the initial level and one at the reconsideration level.

At the initial level, J. Ruiz, M.D., determined the plaintiff had the following impairments: (1) severe discogenic and degenerative disorder of the back, (2) non-severe urinary tract disorder, (3) severe fractures of the lower limb, and (4) severe affective disorders.[43] These findings were consistent with the psychological consultive examination performed by Dr. Van Gaasbeek.[44] Dr. Ruiz analyzed the plaintiff's residual-functional capacity (RFC) and found she could occasionally lift or carry 20 pounds, frequently lift or carry 10 pounds, stand or walk for a total of 6 hours, and sit for a total of 6 hours during an 8-hour work day.[45] The plaintiff had postural limitations but could frequently climb ramps and stairs, balance, stoop, kneel, and crouch.[46] Because the plaintiff's condition was not severe and she could adjust to other work, Dr. Ruiz concluded she was not disabled.[47]

---

[41] *Id.*

[42] *Id.*

[43] AR 97–98.

[44] AR 99.

[45] AR 100.

[46] AR 100–01.

[47] AR 107.

On reconsideration, S. Jacobson, M.D. found the following physical impairments to be severe: (1) discogenic and degenerative disorder of the back, (2) fractures of the lower limb, and (3) affective disorders.[48] Her urinary-tract disorder was non-severe.[49]

Dr. Jacobson assessed the plaintiff's concentration and persistence limitations and found moderate impairments in the following areas: (1) ability to carry out detailed instructions; (2) ability to maintain attention and concentration for extended periods; and (3) ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform a consistent pace without an unreasonable number and length of rest periods.[50] Dr. Jacobson also assessed her social-interaction limitations, and found moderate impairments in the following areas: (1) ability to interact appropriately with the general public and (2) ability to get along with coworkers or peers without distracting them or exhibited behavior extremes.[51] The plaintiff had no adaptation limitations.[52]

Dr. Jacobson found Dr. Van Gaasbeek's CE report to be "less persuasive" because it was "without substantial support from other evidence of record."[53] He determined that the plaintiff was not disabled.[54]

### 3.2    Administrative Hearings

There were two administrative hearings in this case: January 1, 2018 and May 15, 2018.[55]

#### 3.2.1    January 1, 2018 Hearing

The ALJ heard testimony from the plaintiff and vocational expert (VE) Lindel.[56]

---

[48] AR 119.

[49] *Id.*

[50] AR 123.

[51] AR 124.

[52] *Id.*

[53] AR 124–25.

[54] AR 127.

[55] AR 60–87; AR 30–59.

[56] AR 68-83; 83–86.

The ALJ questioned the plaintiff. She testified that she was 43 and had been a seasonal fragrance salesperson for various companies from November 2015 until late in 2017.[57] Before her seasonal work as a fragrance salesperson, she attended nursing school in the Ukraine in 1996, and worked as a receptionist, medical caregiver, aesthetician, and a retail sales associate.[58] She hadn't worked since December 24, 2017.[59]

The plaintiff alleged two major workplace injuries. The first occurred in 2007 while she was working as a caregiver, and the second occurred in 2013 while she was working at Macy's.[60] Both were injuries to her back.[61] After the 2013 injury, she experienced "very sharp pain" from her back running to her legs.[62] She sought medical treatment and was given an epidural.[63] She developed urinary incontinence from the epidural and a blood infection, and she was hospitalized for four days.[64] She went back to work temporarily and eventually settled a worker's compensation claim with Macy's in 2015.[65]

The plaintiff fell and broke her ankle in April 2015.[66] She required surgery, metal plates, and screws for her ankle and was subsequently confined to a wheelchair.[67] After this injury, she worried about money and developed a "very deep depression."[68] She was prescribed Venlafaxine

---

[57] AR 68, 70–71.

[58] AR 69–73.

[59] AR 68–71.

[60] AR 74–76.

[61] *Id.*

[62] AR 76.

[63] *Id.*

[64] AR 76–77.

[65] AR 78–79.

[66] AR 80.

[67] AR 79–81.

[68] AR 81.

and Baclofen for her mental health, Coumadin, and a medical injection for her thrombosis.[69] On December 7, 2017, she was divorced from her husband, and it was "not an easy time" for her.[70]

VE Lindel testified about the plaintiff's past work as (1) a medical receptionist (sedentary work, (2) a home attendant (medium work), (3) a salesperson of cosmetic and toiletries (light work), and (4) an esthetologist (light work).[71] The ALJ posed a first hypothetical to the VE, but the transcript ends abruptly and there is no other record of the remainder of the VE's testimony.[72]

### 3.2.2 May 15, 2018 Hearing

The ALJ heard testimony from the plaintiff, medical expert Robert Thompson, M.D., and VE Jose Chaparro.

The plaintiff testified about her current health. None of her medical symptoms had improved except that her leg had stopped bothering her, and doctors were treating a wound the developed near the fracture site.[73] She was treating her urinary incontinence and back pain with Oxycodone twice per day or Tramadol if she needed to be alert.[74] She was having trouble sleeping, and she required assistance from a caregiver to help her shower, clean, and shop.[75]

The plaintiff recounted her work history. She did not work between 2014 and November 2015. In November 2015, she began working as a seasonal fragrance salesperson until December 24, 2017. She has not worked since.[76]

Robert Thompson, M.D. testified that the plaintiff's medical impairments were "primarily problems with the back."[77] He noted several degenerative or bulging discs in her spine and partial

---

[69] AR 82–83.

[70] AR 83.

[71] AR 84.

[72] AR 84–87.

[73] AR 37, 49.

[74] AR 43–44, 47.

[75] AR 44, 47–48.

[76] AR 45–47.

[77] AR 39.

cauda equina syndrome manifesting as urinary incontinence.[78] The plaintiff had "decreased lumbar spine range of motion, muscle spasms, normal gait using no assistive device, negative straight-leg raising, and normal reflexes."[79] Her ankle fracture was healing with "some swelling and pain on weight-bearing and pain with forced inversion and normal reflexes."[80] She was obese and had "a left over-extremity deep vein thrombosis, [a]nd psychological issues."[81]

Dr. Thompson provided his assessment of the plaintiff's RFC. He opined that she could lift and carry 10 pounds frequently and 11 to 20 pounds occasionally.[82] She could sit for a maximum of two hours at one time and stand and walk (or a combination of the two) for a maximum of one hour at a time.[83] In an eight-hour workday, the plaintiff could sit, stand, or walk (or any combination of the three) for six hours total.[84] There were no restrictions on the use of her hands. She could frequently use her right foot and occasionally use her left foot.[85]

Dr. Thompson recommended prohibiting the plaintiff from using ladders, scaffolds, crouching and crawling but allowing her to stoop and kneel occasionally.[86] He recommended prohibiting unprotected heights and moving mechanical parts.[87] The plaintiff's ability to shop and travel were unimpaired with "some slightly reduced rate over uneven ground." [88]

Finally, Dr. Thompson added that ready access to a bathroom would be "very desirable" for someone with urinary incontinence.[89]

---

[78] AR 38–39.

[79] AR 40.

[80] AR 40–41.

[81] AR 41.

[82] *Id.*

[83] *Id.*

[84] *Id.*

[85] *Id.*

[86] AR 42.

[87] *Id.*

[88] *Id.*

[89] AR 43.

VE Jose Chaparro testified about the plaintiff's past work as (1) a cosmetologist (skilled, light work), (2) a home attendant (semiskilled, medium work but heavy as performed), (3) a receptionist (semiskilled, sedentary work);, and (4) a cosmetics and toiletries salesperson (semiskilled, light work).[90]

The ALJ posed the first hypothetical to the VE: a person of the plaintiff's age, education, and work experience who can (1) "lift and carry 10 pounds frequently, 11 to 20 pounds occasionally," (2) sit for two hours at one time for a total of six hours in an eight-hour day, (3) stand for one hour, walk for one hour, or engage in a combination of both for a total of six hours in an eight-hour day, (4) frequently use right-foot controls and occasionally use left-foot controls, and (5) occasionally stoop, kneel, and climb stairs and ramps. The person cannot (1) climb ladders, ropes, or scaffolds, (2) crouch or crawl, or (3) work at unprotected heights or in environments with moving mechanical parts or heavy industrial vibrations. Finally, the person requires "an environment where there is ready access to a restroom."[91] Under this hypothetical, the VE testified that a person could perform all the plaintiff's past work except home attendant.[92]

The ALJ posed a second hypothetical to the VE. "Instead of being able to stand and walk for a total of six hours in an eight-hour day, now it's reduced to a total of four hours of standing and walking per day, still with the one hour at a time."[93] The VE testified that, out of the plaintiff's past work, she could perform only the work of a receptionist.[94]

The ALJ posed a third hypothetical to the VE. In addition to the conditions of the second hypothetical, the individual is "limited to performing simple, repetitive tasks" because of "pain and medication."[95] The VE testified the following jobs were available: (1) sub-assembler, (2)

---

[90] AR 52.

[91] AR 53–54.

[92] AR 54.

[93] *Id.*

[94] *Id.*

[95] AR 55.

paper-pattern folder, and (3) addresser.[96]

The ALJ posed a fourth hypothetical based on hypothetical two and added that "the individual would be off task 20 percent of the workday."[97] The VE testified that there were no jobs available for someone with these limitations, either from the plaintiff's previous work or in the national economy.[98]

### 3.3   ALJ Findings

The ALJ analyzed the five-step process to determine whether the plaintiff was disabled and concluded that she was not.

At step one, the ALJ found that although the plaintiff was engaged in periods of substantial gainful activity between 2015 and 2017, there was a continuous 12-month period when she did not.[99]

At step two, the ALJ found that the plaintiff had the following severe impairments: (1) degenerative disc disease of the lumbar spine; (2) right L5–S1 foraminal injury; (3) left bimalleolar fracture status post open reduction and internal fixation; (4) deep vein thrombosis of the left leg; (5) obesity; and (6) depressive disorder.[100]

At step three, the ALJ found that, including the plaintiff's mental and physical impairments or combination of impairments, her condition did not meet or medically equal the severity of a listed impairment.[101]

Before reaching step four, the ALJ determined the plaintiff's RFC:

> The claimant has the [RFC] to perform light work. . .with the following modifications: sit for 2 hours at a time for a total of 6 hours in an 8 hour work day; [s]tand for 1 hour at a time and walk for one hour at a time; stand and walk for a total of 4 hours out of 8 hour day; operate foot controls with right lower extremity; occasionally operate foot controls with left lower extremity; occasionally climb stairs and ramps; occasionally stoop and kneel; never

---

[96] AR 55–56.

[97] AR 54.

[98] *Id.*

[99] AR 11–12.

[100] AR 12.

[101] AR 12–13.

climb ladders ropes or scaffolds; never crouch or crawl; no work at unprotected heights or around moving mechanical parts; no work in an environment with heavy industrial vibrations; ready access to a restroom; can perform simple repetitive tasks.[102]

At step four, the ALJ found that the plaintiff was unable to perform any past relevant work.[103]

At step five, the ALJ found that the following jobs were available to the plaintiff: (1) sub-assembler, (2) paper-pattern folder, and (3) addresser.[104]

The ALJ concluded that the plaintiff was "not disabled."[105]

## STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), district courts have jurisdiction to review any final decision of the Commissioner if the claimant initiates a suit within sixty days of the decision. A court may set aside the Commissioner's denial of benefits only if the ALJ's "findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009) (cleaned up); 42 U.S.C. § 405(g). "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). The reviewing court should uphold "such inferences and conclusions as the [Commissioner] may reasonably draw from the evidence." *Mark v. Celebrezze*, 348 F.2d 289, 293 (9th Cir. 1965). If the evidence in the administrative record supports the ALJ's decision and a different outcome, the court must defer to the ALJ's decision and may not substitute its own decision. *Tackett v. Apfel*, 180 F.3d 1094, 1097– 98 (9th Cir. 1999). "Finally, [a court] may not reverse an ALJ's decision on account of an error that is harmless." *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012).

---

[102] AR 13–14.

[103] AR 20–21.

[104] AR 21.

[105] AR 22.

**GOVERNING LAW**

A claimant is considered disabled if (1) he suffers from a "medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months," and (2) the "impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. . . ." 42 U.S.C. § 1382c(a)(3)(A) & (B). The five-step analysis for determining whether a claimant is disabled within the meaning of the Social Security Act is as follows. *Tackett*, 180 F.3d at 1098 (citing 20 C.F.R. § 404.1520).

> **Step One.** Is the claimant presently working in a substantially gainful activity? If so, then the claimant is "not disabled" and is not entitled to benefits. If the claimant is not working in a substantially gainful activity, then the claimant's case cannot be resolved at step one, and the evaluation proceeds to step two. See 20 C.F.R. § 404.1520(a)(4)(i).
>
> **Step Two.** Is the claimant's impairment (or combination of impairments) severe? If not, the claimant is not disabled. If so, the evaluation proceeds to step three. See 20 C.F.R. § 404.1520(a)(4)(ii).
>
> **Step Three.** Does the impairment "meet or equal" one of a list of specified impairments described in the regulations? If so, the claimant is disabled and is entitled to benefits. If the claimant's impairment does not meet or equal one of the impairments listed in the regulations, then the case cannot be resolved at step three, and the evaluation proceeds to step four. See 20 C.F.R. § 404.1520(a)(4)(iii).
>
> **Step Four.** Considering the claimant's RFC, is the claimant able to do any work that he or she has done in the past? If so, then the claimant is not disabled and is not entitled to benefits. If the claimant cannot do any work he or she did in the past, then the case cannot be resolved at step four, and the case proceeds to the fifth and final step. See 20 C.F.R. § 404.1520(a)(4)(iv).
>
> **Step Five.** Considering the claimant's RFC, age, education, and work experience, is the claimant able to "make an adjustment to other work?" If not, then the claimant is disabled and entitled to benefits. See 20 C.F.R. § 404.1520(a)(4)(v). If the claimant is able to do other work, the Commissioner must establish that there are a significant number of jobs in the national economy that the claimant can do. There are two ways for the Commissioner to show other jobs in significant numbers in the national economy: (1) by the testimony of a vocational expert or (2) by reference to the Medical-Vocational Guidelines at 20 C.F.R., part 404, subpart P, app. 2.

For steps one through four, the burden of proof is on the claimant. At step five, the burden shifts to the Commissioner. *Gonzales v. Sec'y of Health & Hum. Servs.*, 784 F.2d 1417, 1419 (9th Cir. 1986).

**ANALYSIS**

The plaintiff contends the ALJ erred by (1) improperly weighing medical evidence and (2) improperly matching the plaintiff's RFC to available jobs in the national economy. The court remands on both grounds.

**1. Whether the ALJ Erred in Weighing the Medical Evidence**

The ALJ is responsible for "resolving conflicts in medical testimony, and for resolving ambiguities." *Garrison v. Colvin*, 759 F.3d 995, 1010 (9th Cir. 2014) (quotation omitted). In weighing and evaluating the evidence, the ALJ must consider the entire case record, including each medical opinion in the record, together with the rest of the relevant evidence. 20 C.F.R. § 416.927(b); *see Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007) ("[A] reviewing court must consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence.") (cleaned up).

"In conjunction with the relevant regulations, [the Ninth Circuit has] developed standards that guide [the] analysis of an ALJ's weighing of medical evidence." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008) (citing 20 C.F.R. § 404.1527). Social Security regulations distinguish among three types of physicians: (1) treating physicians; (2) examining physicians; and (3) non-examining physicians. 20 C.F.R. § 416.927(c) & (e); *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). "Generally, a treating physician's opinion carries more weight than an examining physician's, and an examining physician's opinion carries more weight than a reviewing [non-examining] physician's." *Holohan v. Massanari*, 246 F.3d 1195, 1202 (9th Cir. 2001) (citing *Lester*, 81 F.3d at 830); *Smolen v. Chater*, 80 F.3d 1273, 1285 (9th Cir. 1996).

"To reject [the] uncontradicted opinion of a treating or examining doctor, an ALJ must state clear and convincing reasons that are supported by substantial evidence." *Ryan*, 528 F.3d at 1198 (alteration in original) (cleaned up). By contrast, if the ALJ finds that the opinion of a treating or examining physician is contradicted, a reviewing court will require only that the ALJ provide "specific and legitimate reasons supported by substantial evidence in the record." *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998) (cleaned up); *see Garrison*, 759 F.3d at 1012 ("If a

treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence.") (cleaned up). "The opinions of non-treating or non-examining physicians may also serve as substantial evidence when the opinions are consistent with independent clinical findings or other evidence in the record." *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002). An ALJ errs when he "rejects a medical opinion or assigns it little weight" without explanation or without explaining why "another medical opinion is more persuasive, or criticiz[es] it with boilerplate language that fails to offer a substantive basis for his conclusion." *Garrison*, 759 F.3d at 1012–13. "[F]actors relevant to evaluating any medical opinion, not limited to the opinion of the treating physician, include the amount of relevant evidence that supports the opinion and the quality of the explanation provided[,] the consistency of the medical opinion with the record as a whole[, and] the specialty of the physician providing the opinion. . . ." *Orn*, 495 F.3d at 631 (citing 20 C.F.R. § 404.1527(d)(3)–(6)); *see also Magallanes v. Bowen*, 881 F.2d 747, 753 (9th Cir. 1989) (an ALJ need not agree with everything contained in the medical opinion and can consider some portions less significant than others).

The plaintiff contends that the ALJ erred by giving "no weight" to Dr. Van Gaasbeek's opinion. Dr. Van Gaasbeek examined the plaintiff and determined that she had marked impairments in her ability to (1) interact with co-workers and the public, (2) maintain regular attendance in a workplace, (3) complete a normal workday without interruptions from a psychiatric condition, and (4) deal with usual workplace stress.[106] Her ability to perform detailed and complex tasks was mildly impaired.[107] She was unimpaired in her ability to (1) perform simple, repetitive tasks, (2) accept instructions from supervisors, and (3) perform work activities on a consistent basis without special or additional instruction.[108]

---

[106] AR 927–28.

[107] AR 927.

[108] *Id.*

United States District Court
Northern District of California

Dr. Van Gaasbeek is an examining psychologist, and his opinion is contradicted by the opinions of Dr. Ruiz and Dr. Jacobson. Thus, the ALJ was required to give specific and legitimate reasons based on substantial evidence to discount his opinion. *Garrison*, 759 F.3d at 1012. The ALJ gave his opinion no weight for three reasons: (1) his opinion was inconsistent with his mental examination of the plaintiff; (2) the plaintiff's treatment for her mental impairments was conservative; and (3) the plaintiff returned to substantial gainful levels of work after Dr. Gaasbeek's evaluation.[109]

First, the ALJ's assessment — that Dr. Van Gaasbeek's mental examination does not show findings consistent with marked limitations — is conclusory and not sufficiently specific. An ALJ must provide specific reasons for assigning a contradicted medical opinion little weight. *Reddick*, 157 F.3d at 725. An ALJ errs when she "rejects a medical opinion or assigns it little weight" while "criticizing it with boilerplate language that fails to offer a substantive basis for [her] conclusion." *Garrison*, 759 F.3d at 1012.

Dr. Van Gaasbeek based his opinion upon a review of the plaintiff's psychological history, including her history of depression and panic attacks and her use of anti-depressant medication. Moreover, Dr. Van Gassbeek diagnosed the plaintiff with major depressive disorder and identified the areas where she had marked limitations.[110] The ALJ gave Dr. Van Gaasbeek's opinion no weight because it did not "show findings consistent with marked limitations." Although the ALJ's decision summarized Dr. Van Gaasbeek's examination and opinion, she failed to explain how they were inconsistent. The ALJ's reasoning is boilerplate and thus provides no specific reason for reaching this conclusion. *Id.*

Second, the ALJ's conclusion about the plaintiff's "minimal" treatment is insufficient. She said the plaintiff's "mental health treatment has been minimal and the claimant is no longer taking any psychiatric medications."[111] "Evidence of 'conservative treatment' is sufficient to discount a

---

[109] AR 20.

[110] AR 19–20.

[111] AR 20.

claimant's testimony regarding severity of an impairment." *Parra v. Astrue*, 481 F.3d 742, 751 (9th Cir. 2007) (citing *Johnson v. Shalala*, 60 F.3d 1428, 1434 (9th Cir. 1995) (conservative treatment "suggest[s] a lower level of both pain and functional limitation"). Furthermore, a positive response to conservative and routine treatment can undermine subjective allegations of disabling pain. *Tommasetti v. Astrue*, 533 F.3d 1035, 1039–40 (9th Cir. 2008). But "a claimant cannot be discredited for failing to pursue non-conservative treatment options" where "the record does not reflect that more aggressive treatment options are appropriate or available" or the "claimant has a good reason for failing to obtain treatment." *Lapeirre-Gutt v. Astrue*, 382 F. App'x 662, 664 (9th Cir. 2010).

The plaintiff testified that she received treatment from Lyon Martin Women's Healthcare and San Francisco General and was prescribed Venlafazine and Baclofen to combat her depression. She also testified that she stopped taking her medication because her physician at San Francisco General was transferred to Los Angeles, and she believed that "there is nobody who can prescribe [her]."[112] The ALJ did not ask any additional questions about this subject.

The record shows that the plaintiff frequently received treatment for depression. Moreover, her treatment stopped only after her physician was transferred, and not because the plaintiff chose to stop taking her medication. Put another way, the plaintiff's treatment was not reduced to "conservative" levels because of a lower level of pain or functional limitation. It was reduced because of her perceived inability to access the treatment she needs. Even if the plaintiff's belief that there was no one to prescribe her medication was incorrect, there is still no evidence that she has responded positively from the lack of prescription medication.

Third, an ALJ's finding that a plaintiff's work history is inconsistent with a medical opinion can be a sufficiently specific and legitimate reason to discount the opinion. "A conflict between a treating physician's opinion and a claimant's activity level is a specific and legitimate reason for rejecting the opinion." *Ford v. Saul*, 950 F.3d 1141, 1154–1155 (9th Cir. 2020) (citing *Rollins v. Massanari*, 261 F.3d 853, 856 (9th Cir. 2001)). Here, the plaintiff testified at the January 11, 2018

---

[112] AR 82.

hearing that she worked for a fragrance company "seasonally" between 2015 and 2017 (after Dr. Van Gaasbeek's evaluation). The plaintiff testified that her job responsibilities included "educat[ing] the customers about fragrances" and trying to help customers pick a fragrance product.[113] The ALJ concluded that her work was in "customer service" and determined that these responsibilities contradicted Dr. Van Gaasbeek's assessment of a marked impairment in her ability to interact with the public. Given the errors described above and the non-examining consultant's assessment of limited public contact, the court remands for reconsideration of the testimony. Also, while the plaintiff's interactions with customers may have been substantial, in fact, the court has no ability to draw that conclusion from this record (partly because the plaintiff was not represented below). "[A]n ALJ's duty to develop the record further is triggered only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence." *Ford*, 950 F.3d at 1156 (quoting *Mayes v. Massanari*, 276 F.3d 453, 459–60 (9th Cir. 2001)).

The court remands on this ground.

## 2. Whether the ALJ Erred at Step Five

The plaintiff contends that the ALJ erred at step five for three reasons: (1) the plaintiff's RFC is not consistent with the three jobs the VE identified; (2) the jobs identified by the VE do not exist in significant numbers in the national economy; and (3) the jobs of "addresser" and "paper-pattern folder" are obsolete.[114] Because the court remands for reconsideration of the medical evidence, the court remands on this ground too.

"At step five, if (considering residual functional capacity, age, education, and work experience) the claimant is able to do other work, the Commissioner must establish that there are a significant number of jobs in the national economy that the claimant can do." 20 C.F.R. § 404.1520(a)(4)(v). The Commissioner may sustain its burden at step five by posing hypothetical questions to a vocational expert that are based on a claimant's residual functional capacity. The

---

[113] AR 70.

[114] Mot. – ECF No. 22-1 at 14–18; Pl. Reply – ECF No. 26 at 2–6.

vocational expert may give evidence about jobs that a hypothetical employee with the same residual functional capacity as the claimant would be able to perform. *See* 20 C.F.R. § 404.1520(g). A vocational expert's recognized expertise provides the necessary foundation for his or her testimony, and no additional foundation is required. *See Bayliss v. Barnhart*, 427 F.3d 1211, 1217–18. The hypothetical questions must be based on a residual functional capacity for which there exists substantial support in the record. *See Magallanes v. Bowen*, 881 F.2d 747, 756–57 (9th Cir. 1989).

The ALJ's depiction of the claimant's impairments must be "accurate, detailed, and supported by the medical record." *Tackett v. Apfel*, 180 F.3d 1094, 1101 (9th Cir. 1999). "A hypothetical question posed to a vocational expert must 'include all of the claimant's functional limitations, both physical and mental.'" *Brink v. Comm'r Soc. Sec. Admin*., 343 Fed. Appx. 211, 212 (9th Cir. 2009) (quoting *Flores v. Shalala*, 49 F.3d 562, 570 (9th Cir. 1995).). "If a vocational expert's hypothetical does not reflect all the claimant's limitations, then the expert's testimony has no evidentiary value to support a finding that the claimant can perform jobs in the national economy." *Hill v. Astrue*, 698 F.3d 1153, 1162 (9th Cir. 2012) (quotations omitted). While an ALJ "need not include all claimed impairments in his hypotheticals, [] he must make specific findings explaining his rationale for disbelieving any of the claimant's subjective complaints not included in the hypothetical." *Light v. Soc. Sec. Admin*., 119 F.3d 789, 793 (9th Cir. 1997) (quotation omitted). These restrictions on hypothetical questions apply to the hypothetical on which the ALJ bases his findings. *Lewis v. Apfel*, 236 F.3d 503, 517−18 (9th Cir. 2001).

### 2.1 Substantial Number of Applicable Jobs in the National Economy

The plaintiff contends the ALJ erred by finding a substantial number of jobs exists for addresser, paper-pattern folder, and sub-assembler.[115] A claimant is considered disabled if she is unable to perform their previous work or "any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A); *Beltran v. Astrue*, 700 F.3d 386, 389 (9th Cir. 2012). "Work which exists in the national economy" is defined as either the region where the

---

[115] Mot. – ECF 22-1 at 14.

claimant lives or several regions nationally. *Id.* The Commissioner has the burden of establishing whether work exists in the national or regional economy in significant numbers and can do so by the testimony of a vocational expert or reference to the Medical-Vocational Guidelines. *Tackett*, 180 F.3d at 1099. If significant numbers exist in either the regional or national economy, the ALJ's decision must be upheld. *Beltran*, 700 F.3d at 390.

There is no bright-line rule for what constitutes a "significant number," but a "comparison to other cases is instructive." *Id.* (collecting cases). Here, based on the VE's testimony, the ALJ determined there are 10,000 sub-assembler jobs, 8,000 paper-pattern folder jobs, and 6,000 addresser jobs in the national economy.[116] The ALJ did not make a specific finding on the number of these jobs available in the plaintiff's region (Northern California or the San Francisco Bay Area). Nevertheless, the number of jobs available to the plaintiff nationally is not significant.

The Ninth Circuit has found 622,000, 125,000, and 64,000 jobs in the national economy to be significant numbers. *See Thomas v. Barnhart*, 278 F.3d 947, 960 (9th Cir. 2002) (1,300 jobs in Oregon region and 622,000 in the national economy are significant); *Moore v. Apfel*, 216 F.3d 864, 869 (9th Cir. 2000) (7,700 regional and 125,000 national jobs are significant); *Moncada v. Chater*, 60 F.3d 521, 524 (9th Cir. 1995) (2,300 jobs in San Diego County and 64,000 jobs nationwide are significant). Similarly, courts in the Northern District have found significant numbers of jobs available nationally are somewhere in the tens of thousands and typically exceed 25,000. *Allino v. Colvin*, 83 F.Supp. 3d 881, 888 (N.D. Cal. March 19, 2015) (a significant number of jobs available nationally typically exceeds 25,000); *see also Day v. Colvin*, No. 14-cv-04919-KAW, 2015 WL 5961647 at *2 (N.D. Cal. Oct. 13, 2015) (finding significant numbers to be in the tens of thousands).

Comparatively, 4,752, 14,082, 3,000, and 3,700 jobs in the national economy were not significant. *See id.* (3,000 and 3,700 jobs available in the national economy are insignificant, and 6,700 jobs "distributed across the entire nation do not appear to be significant"); *see also Coletta v. Massanari*, 163 F.Supp. 2d 1101, 1106 (N.D. Cal. July 25, 2001) (363 jobs in the state economy

---

[116] AR 21.

and 4,752 positions in the national economy are insignificant); *Valencia v. Astrue*, No. C 11-06223 LB 9, 2013 WL 1209353 at *19 (N.D. Cal. March 25, 2013) (substantial evidence did not exist for determining that 14,082 jobs in the national economy was significant). Additionally, based on the number of jobs available nationally, it is unlikely there are a significant number of jobs available to the plaintiff in a heavily populated region like the San Francisco Bay Area or Northern California. *See Day*, 2015 WL 5961647 at *2 ( Northern California is one of the "most populous regions in the country" and therefore requires a larger number of jobs to be significant).

Following the precedent in this district, the court holds the ALJ did not demonstrate that there are a significant number of jobs available to the plaintiff in the national economy.

### 2.2 Whether "Addresser" and "Paper-Pattern Folder" are Obsolete Jobs

The plaintiff contends the ALJ erred because the jobs of "addresser" and "paper-pattern folder" are obsolete and therefore are not appropriate work alternatives.[117] The job of "addresser" is described in the Dictionary of Occupational Titles (DOT) as addressing envelopes by hand or by typewriter. A court in this district recently held that the job of "addresser" is obsolete. *See also Bazan v. Berryhill*, No. 18-cv-01224-KAW, 2019 WL 4751874 at *8 (N.D. Cal. Sept. 30, 2019); *Skinner v. Berryhill*, No. CV 17-3795-PLA, 2018 WL 1631275 at *6 (C.D. Cal. April 2, 2018). Moreover, a 2011 Social Security Administration medical-vocational claims review also found the job of "addresser" to be obsolete.[118] Following this district's precedent and the Social Security Administration, the addresser job is obsolete. *Bazan*, 2019 WL 4751874 at *8. In contrast, other districts in this this circuit have found that the job "paper-pattern folder" is not obsolete. *See Haase v. Astrue*, No. EDCV 11–1902–JPR, 2012 WL 3670639 at *8 (C.D. Cal. Aug. 27, 2012) (finding that the job of "paper-pattern folder" exists in substantial numbers in the economy).

---

[117] Mot. – ECF 22-1 at 16–17.

[118] Social Security Administration Study, Ex. A. to Mot. – ECF 22-2 at 7.

### 2.3 The Plaintiff's RFC

The plaintiff contends that the ALJ failed to reconcile the discrepancies between the DOT and the VE's testimony.[119] An ALJ may not rely on a VE's testimony without first inquiring whether that testimony conflicts with the Dictionary of Occupational titles. *Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007). Such error, however, is harmless where no conflict exists. *Id*. at 1154 n.19; *Wells v. Colvin*, No. 12-cv-05287-JST, 2013 WL 6225180 at *3 (N.D. Cal. Nov. 23, 2013).

The Social Security Administration defines the full range of light work to require "standing or walking, off and on, for combination for a total of six hours in an eight-hour day." SSR 83-10, 1983 WL 31251 at *5– 6 (Jan. 1, 1983). The ALJ assigned the plaintiff an RFC to perform modified light-exertional work and found the plaintiff capable of standing and walking for a total of four hours in an eight-hour day and performing simple and repetitive tasks.[120] Two of the jobs the ALJ identified — sub-assembler and paper-pattern folder — are classified as light-exertional jobs.[121] Thus, the ALJ was required to ask the VE how the plaintiff would be able to perform these jobs in light of her reduced capacity to stand and walk and her ability to perform only simple and repetitive tasks. *Massachi*, 486 F.3d at 1152.

The ALJ asked the VE to inform her if his testimony conflicted with the DOT.[122] He did not do so. This error was not harmless. *Id*. at 1154. Without the VE's explanation, it is impossible to determine whether the ALJ properly relied on the VE's testimony, and it cannot be determined whether substantial evidence supports the ALJ's finding that the plaintiff could perform other work. *Id*. at 1153–54. Moreover, without the sub-assembler and paper-pattern folder jobs, the only job proposed by the VE that the plaintiff was capable of performing is addresser. But as discussed above, the job of addresser is obsolete and does not exist in significant numbers. In sum, the court remands because the jobs proposed by the VE do not exists in sufficient numbers and are inconsistent with the plaintiff's RFC.

---

[119] *Id*. at 17.

[120] AR 13–14.

[121] AR 55–56.

[122] AR 50.

### 3. Remand

The court has "discretion to remand a case either for additional evidence and findings or for an award of benefits." *McCartey v. Massanari*, 298 F.3d 1072, 1076 (9th Cir. 2002) (citation omitted); *McAllister v. Sullivan*, 888 F.2d 599, 603 (9th Cir. 1989) ("The decision whether to remand for further proceedings or simply to award benefits is within the discretion of [the] court.") (citation omitted). Generally, "[i]f additional proceedings can remedy defects in the original administrative proceeding, a social security case should be remanded." *Garrison v. Colvin*, 759 F.3d 995, 1019 (9th Cir. 2014); *see also Dominguez v. Colvin*, 808 F.3d 403, 407 (9th Cir. 2015) ("Unless the district court concludes that further administrative proceedings would serve no useful purpose, it may not remand with a direction to provide benefits.").

Remand is appropriate to "remedy defects in the original administrative proceeding." *Garrison*, 759 F.3d at 1019 (cleaned up).

### CONCLUSION

The court grants the plaintiff's motion for summary judgment, denies the Commissioner's cross-motion, and remands for further proceedings consistent with this order.

**IT IS SO ORDERED.**

Dated: May 14, 2021

_____
LAUREL BEELER
United States Magistrate Judge